**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES E. BIELEFELDT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 11 C 7673** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **CAROLYN COLVIN, Commissioner** | ) | |
| of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The Plaintiff, James E. Bielefeldt, seeks review of the Commissioner ("Commissioner") of the Social Security Administration's ("Agency") final decision denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act") as well as his application for Supplemental Security Income ("SSI") under Title XVI of the Act. Mr. Bielefeldt requests that the court reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.**
**PROCEDURAL HISTORY**

On July 16, 2007, Mr. Bielefeldt applied for DIB and SSI. (Administrative Record ("R") 19). On both applications, he alleged that he has been disabled since February 24, 2005, and attributed his disability to back pain post-lumber laminectomy, diabetes mellitus, and obesity. *Id.* However, both applications were denied initially on October 17, 2007, and then again upon reconsideration on February 27, 2008. (R. 1). Mr.

Bielefeldt pursued his claims by filing a timely written request for hearing on April 28, 2008. (R. 136).

On September 3, 2009, an administrative law judge ("ALJ") presided over a hearing at which Mr. Bielefeldt, represented by counsel, appeared and testified at. (R. 19). Also present was Pamela Tucker, an impartial vocational expert. The ALJ issued an unfavorable decision on January 17, 2010, denying Mr. Bielefeldt's application for DIB and SSI. (R. 19-28). Mr. Bielefeldt filed a timely appeal on July 14, 2011, but the Appeals Council denied his request, making the ALJ's decision final. (R.1)

## II.
## THE RECORD EVIDENCE

### A.
### The Vocational Evidence

Mr. Bielefeldt was born on November 16, 1963, thus he was 46 at the time of the hearing. (R. 46). He lives in a one-story ranch home with his wife and daughter. (R. 48). Mr. Bielefeldt completed high school, and then received vocational training to become a copier repairman. (R. 51). Until his injury, Mr. Bielefeldt was a copier technician with Image Tech for 9 years. (R. 53-54). Prior to this, he held various positions, including technician and pizza deliveryman, and he served in the armed forces. (R. 52, 58, 61). Mr. Bielefeldt has been unemployed since February 24, 2005, but he does volunteer work with an organization called Treasured Friends. (R. 61-62).

Mr. Bielefeldt contends that he is eligible for DIB and SSI due to his back pain status post lumbar laminectomy, his diabetes mellitus, and his obesity. On February 10, 2006, Mr. Bielefeldt underwent a lumbar decompression laminectomy at L4-L5 and L5-S1 levels. (R. 226, 228). Following his surgery, he began physical therapy. (R. 241, 246). After a few months, he noticed some improvements. His physical therapist indicated that he demonstrated the ability to lift 20-50 pounds, and to perform work at a medium to heavy level, with some postural limitations. *Id.*

As time progressed, Mr. Bielefeldt's abilities became more limited, but generally they have remained consistent until June 2008. (R. 266, 307). Over the course of his treatment, Mr. Bielefeldt has received several evaluations from his personal doctors, and two Residual Functioning Capacity ("RFC") assessments from third parties. (R. 279, 299, 334). Initially, his doctor reports indicated that he was unable to work, but by November 2006, his condition changed, and he was permitted to work with the limitation that he could not lift over 40 pounds. (R. 279). Mr. Bielefeldt's condition and limitations remained the same until at least March 2007. (R. 270, 273). His physician, Dr. Payne, repeatedly reported that Mr. Bielefeldt was capable of performing "medium to heavy work" and lifting up to 60 pounds occasionally. (R. 246-61). In an April 2007 report, Dr. Payne added the requirement that Mr. Bielefeldt be allowed to change position every 15 minutes per hour. (R. 266).

Mr. Bielefeldt had a consultative examination with Dr. Stanley Rabinowitz on October 1, 2007. The doctor noted that Mr. Bielefeldt was a non-insulin-dependent

diabetic and was maintaining his glucose levels with oral medication. (R. 302). He noted Mr. Bielefeldt rated his average back pain at 3-4 out of 10. (R. 303). Range of motion in the lumbar spine was limited, but straight leg raising was negative bilaterally in the sitting position. It was positive on the left in the supine position. (R. 304). Reflexes and motor strength were normal. (R. 304).

Dr. Pilapil then reviewed the medical record on behalf of the Agency in October 2007. (R. 299). The doctor indicated that Mr. Bielefeldt retained the ability to perform light work. *Id.* He also noted that Mr. Bielefeldt was restricted to occasionally lifting 20 pounds, standings/sitting/walking to 6 hours in an 8-hour workday, never climbing ladders, and no limitations on the amount he could push or pull. (R. 293-94).

Following this assessment, on December 4, 2007, Dr. Payne submitted a report that indicated that Mr. Bielefeldt could not work above ground level or around high speed machinery. (R. 307). He also could not climb, squat, or lift/push/pull over 20 lbs. *Id.* However, he did determine that he could work in a sitting only job if he could shift every two hours. *Id.*

On December 29, 2007, an MRI revealed degenerative disc disease at multiple levels of the lumbar spine, and moderate disc protrusion at L5-S1. (R. 320). There was neural foraminal stenosis, but no central canal stenosis. (R. 320). In the wake of the report, on January 3, 2008, Dr. Payne reiterated lifting limits of 20 pounds with the same postural limitations from December 4, 2007. (R. 329).

In February 2008, Dr. Patey, performed another review for the Agency. (R. 337). Dr. Patey indicated that Mr. Bielefeldt could occasionally lift 20 pounds, stand, walk or sit about 6 hours in an 8-hour workday, occasionally balance, stoop or kneel, and never

crouch or climb ladders. (R. 337-39). He also noted that Mr. Bielefeld should not be exposed to extreme cold or hazards. (R. 341). Within his report, Dr. Patey referenced the MRI administered by Dr. Payne indicating multi-level degenerative disc disease, and his recommended limitations of not lifting over 20 pounds with some postural limitations. (R. 344).

Finally, in June 2008, Dr. Payne completed a medical evaluation that placed Mr. Bielefeldt on even further restriction. (R. 326-348). He limited Mr. Bielefeldt to only lifting less than 5 pounds. (R. 326). He also stated that his standing and sitting needed to be limited to approximately 2 hours out of an 8-hour day. (R. 347). Dr. Payne also indicated that Mr. Bielefeldt needed to undergo a lumbar fusion due to his unstable lumbar spine. (R. 348).

Within these reports, the doctors have consistently noted that Mr. Bielefeldt experienced varying levels of pain. (R. 263, 279, 363, 365). While his pain levels fluctuated, sometimes he did not experience any increase in pain at all. (R. 278, 288, 365). Generally, Mr. Bielefeldt has stated that his medications and treatments have greatly helped. *Id.* After initial epidural treatments were unsuccessful, Mr. Bielefeldt was prescribed various medications, including Oxycontin, Avinza, Lyrica, Vicodin, Tramadol, Vicoprofen and long-acting Morphine. (R. 274, 277, 288, 372). At doctor visits, Mr. Bielefeldt suggested that Oxycontin was the most effective, and he rarely reported any side effects. (R. 84, 352, 355, 360, 363). At the time of the hearing, Mr. Bielefeldt stated that he was taking Tramadol and Vicoprofen. (R. 405). The records indicate that his most recent doctor visits have primarily been for medication refills. (R. 398-99).

**C.**
**The Administrative Hearing Testimony**

**1.**
**The Plaintiff's Testimony**

Mr. Bielefeldt testified that he is 46 years old, 6'3", and weighs approximately 390 pounds. (R. 46, 71). He also testified that he has a driver's license, and no restrictions on his driving abilities. (R. 50). However, he noted that sometimes he finds it difficult to drive for long periods of time, but that he drove 45 minute to the hearing that day. (R. 50-51).

At the hearing, Mr. Bielefeldt testified that he graduated from high school, and received vocational training as a copier repairman. (R. 51) He explained that he was a copier technician who specialized in high-end or high-speed copiers, until he was injured in January 2005. (R. 53). On the day he was injured, Mr. Bielefeldt was working on a 7075 Konica. (R. 54). That day, he pulled out the machine to get to the back, and felt a muscle pulling in his back. *Id.* Although he did not feel great, he continued to work, and the next day he was in terrible pain. (R. 55). He stated that he went to his doctor's office a day or two after the incident, and his doctor prescribed him pain pills and time off. *Id.* Mr. Bielefeldt testified that per his doctor's direction, he took 4 days off, but when he went to work to turn in his doctor's note, he was fired on the spot. (R. 55-56).

While working at Image Tech, Mr. Bielefeldt moved machines that weighed approximately 500-800 pounds. (R. 56). He also disconnected finishers and high capacity cassettes that weighed about 150 to 200 pounds, and took out process units that weighed about 150 pounds. (R. 57). He disassembled machines, replaced used parts, and then

tested the machines. *Id.* He explained that while diagnosing a machine, he was usually bending over or kneeling because everything he worked on was lower than his waist. *Id.* Mr. Bielefeldt testified that sometimes he would have to sit on the floor to examine parts that were found lower on the machine. (R. 57-58). Mr. Bielefeldt indicated that he rarely stood while at work because there was a lot of walking to retrieve parts from his truck. (R. 58).

Prior to Image Tech, Mr. Bielefeldt stated that he worked at Distinctive Business Systems for five years. (R. 58-59). He was a rebuilder, which consisted of tearing apart the machine and then rebuilding it with new parts. (R. 59). He testified that at Distinctive he had to lift about the same amount of weight, but more often. (R. 60). Mr. Bielefeldt stated that he is no longer employed, and has not been employed since February 24, 2005. (R. 61).

Mr. Bielefeldt testified that although he did not work, after his injury, he started to volunteer with an animal rescue organization called Treasured Friends. (R. 62, 65). While volunteering with Treasured Friends, one of his duties is to take animals to either a humane society, which is 20 minutes from his house or an animal hospital, which is only 10 minutes away from his house. (R. 64). For cats, this process involves lifting the 10-15 pound caged animal for about 10 feet into his van, whereas for dogs, they usually just walk into the van themselves. (R. 62-63, 67). Mr. Bielefeldt stated that he picks up animals from various locations up to 2 times a week, and that this process usually takes about an hour. (R. 64-65). Mr. Bielefeldt also explained that he would sometimes assist with showings as well. *Id.* During these showings, he would stand or sit and hold onto a leash for 2 to 3 hours. *Id.* Mr. Bielefeldt indicated that a vocational expert suggested that

he start volunteering, but this was not until after he stopped working. (R. 65-66). Mr. Bielefeldt testified that he volunteers, on average, once a week. (R. 67).

In describing his injury, Mr. Bielefeldt testified that he has sought a number of treatments to reduce his pain. (R. 68-78). Most recently, after having an MRI done he discovered that his next treatment would be a fusion. (R. 79-80). However, Mr. Bielefeldt explained that he has not yet undergone this surgery because he could not afford the surgery. (R. 82). Mr. Bielefeldt testified that his injury causes him to feel a constant dull pain that is aggravated when sitting or standing. (R. 83). Moreover, he complained that driving is difficult because of the sitting and moving his legs, but noted that he is able to sit for approximately 35-40 min without making it worse. *Id.* He also stated that he could only walk a block without stopping, and that his pain is mostly in the right side of his back. (R. 83, 85). Mr. Bielefeldt explained that he takes a combination of Vicoprofen and Tramador, but that neither is as effective as Oxycontin, but his doctors will not prescribe it to him because of his history with gallbladder disease. (R. 84). Mr. Bielefeldt also testified that Oxycontin made him drowsy, and so does his current medication, but that he drinks coffee to counteract it. (R. 94).

Mr. Bielefeldt explained that typically his day begins at 7:00am. (R. 86). He testified that he usually needs help getting on his pants, shoes, and socks. (R. 87). He stated that after he wakes up his daughter, he just lies around all day. *Id.* However, he also explained that sometimes he helps his wife with the grocery shopping, but that he can only carry bags that are 10-15 pounds or a gallon of milk. (R. 88). Mr. Bielefeldt further indicated that he usually drives because it is safer due to his wife's eye problems. *Id.* He also testified that he sometimes visits his mother who lives 20 minutes away. *Id.*

He indicated that he goes to church on a weekly basis, a drive-in movie on occasion, but mostly just talks to his wife or on the phone, sleeps, and lays down. (R. 90-91). Mr. Bielefeldt explained that he is not prescribed a cane, but may use one on longer walks. (R. 92). He testified that he needs to lie down for 4 hours out of the day, and since his surgery, he has never gone a day without lying down. (R. 93). Mr. Bielefeldt concluded his testimony by describing how after the hearing he will have to lay down for 3-4 hours, and that he even might have to lay down in his van in the parking lot before he leaves. (R. 96).

## 2.
## The Vocational Expert's Testimony

Ms. Tucker testified as a vocational expert. (R. 97). She explained that Mr. Bielefeldt's prior work was classified as an office equipment mechanic, which is considered light unskilled per DOT, but medium to heavy as performed. (R. 99). At this time, the ALJ presented Ms. Tucker with a hypothetical of an individual with the limitations of occasionally lifting 20 pounds, but frequently lifting 10; standing or walking for 6 hours and sitting for 6 hours; and the occasional climbing of ramps or stairs, but never climbing ladders, ropes, scaffolds, and occasional crouching or crawling. *Id.* In response to the ALJ's hypothetical, Ms. Tucker testified that such a person could not perform the past work that Mr. Bielefeldt performed. (R. 100-01). However, Ms. Tucker indicated that such a person could perform the work of an assembler and packer. (R. 101-02). In the local economy, there were 3800 assembler positions and 12,000 packer positions. (R. 101-02)

The ALJ then limited the previous hypothetical further, such that the person would have to change their position from standing to sitting every 60 minutes for about 5 to 10 minutes; never crouch; and, avoid exposure to extreme cold. (R. 102-103). Ms. Tucker testified that such a person could still perform the assembler and packer positions as well as weigher and checker positions. (R. 103). Ms. Tucker advised that none of these jobs would allow for assuming a horizontal position while working. (R. 104).

The final hypothetical that the ALJ presented described a person that could only lift less than 5 pounds; he could stand walk for 1 hour; he could sit for 2 hours, but would need to change positions frequently; he could not do any pushing or pulling over 10 pounds; he could balance occasionally, but never climb, stoop, crouch, kneel or crawl; and exposure to moving machinery would be limited. (R. 104-105). Ms. Tucker stated that a person with these limitations could perform the work of a bunch worker (700 positions), an assembler (1200), and a sorter (350 positions). (R. 106-07). However, if a person had to rest in a reclining position more than two times, even if for less than 30 minutes, there would not be any position available. (R. 107).

### III.
### THE ALJ'S DECISION

The ALJ concluded that Mr. Bielefeldt "has not been under a disability within the meaning of the Social Security Act from February 24, 2005 through the date of this decision." She found that Mr. Bielefeldt had the following severe impairments: status post lumbar decompression laminectomy at L4-L5 and L5-S1 and obesity. (R. 21). Neither of these impairments met or equaled an impairment in the Listings of Impairments. (R. 22). The ALJ found that Mr. Bielefeldt "has the residual functional

capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)" with the additional limitations of being able to alternate between standing and sitting, never climbing ladders, ropes, or scaffolds, never crouching, and only occasionally climbing ramps and stairs, occasionally balancing, stooping, kneeling, and crawling, and avoiding concentrated exposure to intense cold. (R. 22). In making this determination, the ALJ first considered whether there is an underlying medically determinable impairment that could reasonable produce Mr. Bielefeldt's symptoms, and to what extent the intensity and persistence of such symptoms limit his ability to work. (R. 23). The ALJ found that Mr. Bielefeldt's lower back pain stemming from his January 14, 2005 injury could reasonably cause the symptoms that he alleged. (R. 23). However, the ALJ found that Mr. Bielefeldt's "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 23).

In evaluating his credibility, the ALJ considered the objective medical evidence, medical treatments, his medications, and his daily activity. (R. 23). The ALJ also considered "the factors enumerated in Social Security Ruling 96-7p in evaluating the intensity, persistence, and limiting effects of the claimant's symptoms." (R. 23). Specifically, the ALJ noted that Mr. Bielefeldt last worked in March 2005 when he was injured pulling out a copier from the wall. *Id.* Initially, he engaged conservative treatment, including epidurals, but when that failed, he underwent a revisional lumbar decompressive laminectomy in February 2006. *Id.* After this, he was still in pain, but engaged in physical therapy. He still had significant postural limitations, but after a few

months, he was discharged and was able to work at medium to heavy levels. (R. 24). He also took medication that was very effective. *Id.*

The ALJ noted that in October 2007, Mr. Bielefeldt had a clinical examination that indicated he was extremely obese. *Id.* His range of motion was normal, and most recent straight leg raising testing was negative. His recent doctor visits primarily involved test results and medicine refills, with few complaints. *Id.* As of the hearing date, Mr. Bielefeldt had not undergone surgery, which was recommended because of an MRI that indicated he had multi-level degenerative disc disease. *Id.* According to the ALJ, the records indicate that Dr. Payne would like to hold off on surgery. (R. 24).

The ALJ also considered the medications that Mr. Bielefeldt has taken for pain control, including Oxycontin, which he indicated had "excellent pain control." *Id.* He also suggested that this medication makes him dizzy, but he never reported any side effects to his pain management physician. *Id.*

The ALJ further found Mr. Bielefeldt's activities to be quite extensive. (R. 24). He independently takes care of himself, but sometimes has difficulty with bathing from the knees down, and putting on his pants and socks. *Id.* The ALJ noted that Mr. Bielefeldt volunteers with a group called Treasured Friends, an animal rescue group. *Id.* The animals he works with range from 10 to 50 pounds. *Id.* While volunteering with them, Mr. Bielefeldt testified that he picks up animals, and transports them, which usually takes up to an hour. *Id.* The ALJ also noted that sometimes Mr. Bielefeldt would show the animals on the weekends, which can last 2 to 3 hours. (R. 24). The ALJ stated that his participation in this program "sheds some light on the claimant's abilities," and that although only once a week the activities that he describes are "inconsistent with his self-

assessed limitations. *Id.* In particular, the ALJ explained that his activities substantially rebut the notions that he cannot stoop, bend forward, kneel or reach; he can only sit/stand for 30-45 minutes at a time; and "his medication makes it impossible for him to drive." *Id.* The ALJ noted that, while volunteering, he is likely lifting a significant amount of weight, and bending and stooping when handling the animals. *Id.* The ALJ also found that he is frequently driving around for errands related to the shelter as well as performing personal errands such as driving to the hearing. (R. 24-25). The ALJ found this inconsistency significant. (R. 25).

The ALJ then discussed two Residual Functional Capacity forms filled out by the State agency. *Id.* The first one placed Mr. Bielefeldt at the light exertional level with postural limitations, and the ALJ assigns it great weight because it is consistent with the evidence as a whole. *Id.* But notes, that Mr. Bielefeldt requires a stand/sit option. *Id.* The second RFC form also classified him as able to perform work at a light exertional level with restriction. *Id.* Specifically, he can carry a maximum of 20 pounds, and sit/stand/walk for 6 hours in an 8-hour workday. (R. 25). The Residual Functional Capacity assessment also indicated that he needed to change positions every hour, and should avoid exposure to extreme cold and hazards. *Id.* The ALJ also affords this Residual Functional Capacity assessment great weight, but disagrees as to the environmental restrictions regarding hazards, and Mr. Bielefeldt's testimony as to the side effects of his medications. *Id.*

The ALJ finally turns to Mr. Bielefeldt's treating physician and physical therapist. (R. 25-26). The ALJ gives no weight to the opinion of his treating physician because his June 2008 report significantly limited Mr. Bielefeldt's abilities attributing it only to the

instability in his lumbar spine without any significant changes or support for such limitations. (R. 25). Moreover, the ALJ believes Dr. Payne's opinion is inconsistent with not only the objective medical evidence, but even from his opinions that he had given as early as 6 months prior. *Id.* The ALJ assigns little weight to Mr. Bielefeldt's physical therapist's opinion because it was much less restrictive, and was given shortly after his laminectomy, which examinations since have revealed he has some limited range of motion. (R. 26). The ALJ also assigned some weight to a work conditioning progress note filled out by Michelle Hannigan. *Id.*

Accordingly, the ALJ found that while Mr. Bielefeldt's "impairments are severe, they do not preclude him from completing basic work related activities." (R. 26). While Mr. Bielefeldt is not able to perform any past relevant work, there are jobs in the national economy that he can perform, with restrictions. (R. 26-27). Specifically, the ALJ found that Mr. Bielefeldt can perform light work, with the following restrictions: lifting/carrying a maximum of 20 pounds; sitting/standing/walking for 6 hours with the ability to alternate between standing and sitting every hour for 5 to 10 minutes; no climbing ladders, ropes or scaffolds; no crouching; only occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, and crawling; and that he must avoid concentrated exposure to extreme cold. (R. 22). Based on the testimony of the vocational expert, the ALJ determined that Mr. Bielefeldt could perform work that exists in significant numbers in the economy. Accordingly, she found him not disabled and not entitled to benefits under the Act.

# IV.
# DISCUSSION

## A.
## The Standard of Review

We review the ALJ's decision directly, but we play an "extremely limited" role. *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009); *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993). If it is, the court must affirm the decision. 42 U.S.C. § 405(g). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010).

While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Although the ALJ need not address every piece of evidence, the ALJ cannot limit discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696,698 (7th Cir. 1994). The ALJ must "minimally articulate" the reasons for his ultimate conclusion by building, as the Seventh Circuit calls it, a "logical bridge" between the evidence and the ALJ's conclusion. *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001); *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir.

1996). The Seventh Circuit has stated that this is a "lax" standard. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

## B.
## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila*, 573 F.3d at 512-13; *Briscoe ex rel Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step 4; if it is met, the burden shifts at step 5 to the Commissioner, who must then present evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in a

significant quantity in the national economy. *Weatherbee*, 2011 U.S. App. LEXIS 16416, 2011 WL 3506107 at *3; *Briscoe*, 425 F.3d at 352.

## C.
## ANALYSIS

Mr. Bielefeldt advances two arguments for reversal or remand: (1) the ALJ erroneously rejected treating physician Dr. Payne's opinion and (2) the ALJ's rejection of the Plaintiff's pain and limitations as not credible is not support by substantial evidence of record.

### 1.
### Rejection of Treating Physician Dr. Payne's Opinion

Mr. Bielefeldt challenges the ALJ's decision to reject his treating physician's, Dr. Payne's, opinion. Specifically, he asserts that the ALJ "failed to consider the consistency of the treating physician's opinion and records." *See* Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security, 9. ("Plaintiff's Brief"). However, despite Mr. Bielefeldt's contentions, the ALJ thoroughly supported her decision to reject Dr. Payne's opinion.

While an ALJ may choose to give a treating physician's opinion controlling weight if it is "well-supported by medical clinical and laboratory diagnostic techniques," she is not required to do so if it is not consistent with other substantial evidence, and she is able to provide "good reasons" for how much weight is accorded. 20 C.F.R. § 404.1527(d)(2); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir.2005); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir.2010); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir.2008). To establish "good reasons," the ALJ must create a logical bridge from the evidence to her conclusion, meaning the ALJ must

"minimally articulate reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir.2000); *Briscoe*, 425 F.3d at 354; *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir.2000).

Here, the ALJ adequately explained why she discredited Dr. Payne's June 2008 opinion. First, the ALJ found that Dr. Payne's opinion was inconsistent with the other substantial evidence. (R. 25). The ALJ explained that not only was Dr. Payne's opinion inconsistent and much more restrictive than the opinions of at least three other medical professionals, but it was also extremely inconsistent from his own earlier opinions, "including an opinion given only six months prior to this opinion." (R. 25). These inconsistencies are significant because Residual Functional Capacity assessments are commonly used to determine the amount of work that a claimant may physically accomplish. 20 C.F.R. § 404.1545(a)(1); *Berger v. Astrue*, 516 F.3d 538, 544 (7th Cir. 2008). The ALJ disagreed with Dr. Payne's attempt to detract from prior Residual Functional Capacity assessments, and opined that "numerous factors mitigate against a finding for greater restrictions than outlined in the residual functional capacity assessed," including the evidence of Mr. Bielefeldt's reduced pain post-surgery, his successful physical therapy, his successful medication regime, and his few complaints. (R. 23-24).

But Mr. Bielefeldt is not satisfied with these considerations. (*Plaintiff's Brief*, pg. 8). He argues that in addition to these factors, the ALJ also needed to consider Dr. Payne's longitudinal relationship and familiarity of the condition as a whole. *Id.* An ALJ doesn't have to recite the considerations applicable to assessing a medical opinion chapter and verse; it is enough that he minimally articulates his reasons and they are supported in the record. *Henke v. Astrue*, 2012 WL 6644201, 3 (7th Cir. 2012); *Elder v.*

*Astrue,* 529 F.3d 408, 415 (7th Cir.2008). And here, the ALJ did consider Dr. Payne's previous relationship with Mr. Bielefeldt. In fact, up until his June 2008 opinion, the ALJ found that Dr. Payne's opinions were aligned with the other substantial findings, which only further supported the ALJ's decision to discredit it. (R. 25). While case law dictates that it is important to account for a treating physician's knowledge, it also suggests that it is equally as important to guard against any bias that a treating physician may develop. 20 C.F.R. § 404.1527(d)(2); *Schmidt*, 496 F.3d at 842; *Skarbek*, 390 F.3d at 503; *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir.2006); *Dixon*, 270 F.3d at 1177. Physician's opinions can sometimes be unreliable because they easily become sympathetic, and allow those emotions to interfere with their disability determinations. *Ketelboeter v. Astrue*, 530 F.3d 620, 625 (7th Cir.2008); *Schmidt*, 496 F.3d at 842. When the ALJ considered whether the treating physician's opinion was inconsistent with other substantial evidence, she properly addressed these two competing interests. *Id.*

The ALJ also supported her decision to reject Dr. Payne's 2008 opinion because he failed to explain why Mr. Bielefeldt's problems were suddenly exacerbated, and thus warranted increased restrictions on his activity. (R. 25). The ALJ explained that no evidence supported the notion that "the claimant's condition changed so drastically [as] to warrant such severe limitations." *Id.* Per Dr. Payne, Mr. Bielefeldt could return to work immediately and perform a job that required lifting and carrying 20 pounds, and sitting, stand, or walk without limitation in January 2008. (R. 329). There were additional postural limitations, but this was, essentially, a limited range of light work.

Six months later, Mr. Bielefeldt couldn't even lift 5 pounds, could stand for just 1 hour in a whole day and sit for just 2 hours. (R. 346-47). While Dr. Payne attempted to

support his report with his statement that the increased limitations were based on Mr. Bielefeldt's unstable lumbar spine, this generic statement did not convince the ALJ. *Id.* What the ALJ was looking for was something that had changed – Mr. Bielefeldt had the same unstable lumbar spine when Dr. Payne gave him rather glowing assessments. But Dr, Payne gave the ALJ no clues.

Mr. Bielefeldt suggests that the change in Dr. Payne's assessment of his capacity for work was triggered by MRI results (*Plaintiff's Brief*, at 8), even though Dr. Payne made no reference to the study when asked in the form what medical findings he based his assessment on. (R. 346). Significantly, Mr. Bielefeldt's own brief demonstrates that this was not the case. Dr. Payne's assessment of Mr. Bielefeldt was the same after the MRI as before. (R. 307, 329). As Mr. Bielefeldt's attorney put it, the doctor simply "reiterated lifting limits of 20 pounds with limited postural activities." (*Plaintiff's Brief*, at 4). As such, the drastic change in Dr. Payne's assessment was not a product of his review of an MRI. It remains unexplained – aside from the speculation of Mr. Bielefeldt's attorney. But that explanation wasn't part of the record the ALJ reviewed and, more importantly, Mr. Bielefeldt's attorney is no more a physician than an ALJ is. *See Myles v. Astrue,* 582 F.3d 672, 677 (7th Cir.2009)(ALJ may not play doctor and fill in evidentiary gaps in the record using his own lay opinion); *Blakes ex rel. Wolfe v. Barnhart,* 331 F.3d 565, 570 (7th Cir.2003); *Schmidt v. Sullivan,* 914 F.2d 117, 118 (7th Cir.1990).

Perhaps it is a sign of how scant the medical evidence is, because that's just one example of Mr. Bielefeldt's attorney playing doctor. Counsel either opines or states that Dr. Payne opines that Mr. Bielefeldt was unable to take medication for his back due to

the onset of gallstone/pancreatitis problems. (*Plaintiff's Brief*, at 9). But there's no support in the record for this. He cites no evidence of Dr. Payne suggesting anything of the kind. The only reference to gallstone/pancreatitis problems are lab results from October 2008. (R. 380-84). No medication regimen in mentioned in the notes. Again, Mr. Bielefeldt's counsel is beyond his depth in prescribing treatment options.

Mr. Bielefeldt also attempted to argue that the ALJ should have given more weight Dr. Payne's opinion because Dr. Patey previously referenced Dr. Payne's reports. (*Plaintiff's Brief*, pg. 9). He asserts that if Dr. Patey would have had the opportunity to review this opinion, he might have reasonably altered his opinion in conformance with it, and thus deference should be given to the treating physician. *Id.* But, again, there are no notes from Dr. Payne to justify the substantial decrease in Mr. Bielefeldt's abilities In June 2008. As such, there would be nothing to persuade Dr. Patey that anything had changed so drastically. The argument improperly relies on mere speculation, and an ALJ may properly reject a treating physician's opinion if medical signs and laboratory findings do not support it. 20 C.F.R. § 404.1527(d)(2)3; *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir.2009); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir.2004). Simply because another professional might have agreed with Dr. Payne's opinion does not automatically suggest that medical signs and laboratory findings supported it.

Moreover, despite the emphasis that Mr. Bielefeldt wishes to accord Dr. Payne's opinion, the Seventh Circuit has repeatedly emphasized that claimant is not entitled to disability benefits simply because a treating physician's states that he is disabled. *Schmidt*, 496 F.3d at 842. Thus, because the ALJ demonstrated that Dr. Payne's opinion

was inconsistent with other substantial evidence, and had good reason to reject it, the ALJ did not err in affording Dr. Payne's opinion no weight.

## 2.
### The ALJ's Rejection of the Plaintiff's Pain and Limitations as Not Credible

Mr. Bielefeldt's final contention is that the ALJ's decision to reject his pain and limitations as not credible is not supported by the substantial evidence. Without direct access to witnesses, the opportunity to observe the claimant testify, and the trier of fact's immersion in the case as a whole, it is difficult for reviewing courts to evaluate credibility. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir.2010); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir.2004). *Compare Ashcraft v. Tennessee*, 322 U.S. 143, 171, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (Jackson, J., dissenting) ("A few minutes observation of the parties in the courtroom is more informing than reams of cold record."). Thus, in reaction to these difficulties, courts review ALJs' credibility determinations with "special deference." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010); *Briscoe*, 425 F.3d at 354; *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir.2010); *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir.2008). A reviewing court will only reverse an ALJ's credibility determination if it is "patently wrong," meaning it lacks any explanation or support. *Jones*, 623 F.3d at 1160-62; *Simila*, 573 F.3d at 517; *Elder*, 529 F.3d. at 413–14; *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir.2006); *Berger*, 516 F.3d at 546. Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue*, 390 Fed. Appx. 581, 587 (7th Cir. 2010).

In the instant case, the ALJ provided sufficient evidence to justify her conclusion. Specifically, the ALJ found that although Mr. Bielefeldt's medically determinable impairments could reasonably be expected to cause his alleged symptoms, his statements are not fully credible to the extent that they are inconsistent with the residual functional capacity assessment. (R. 23). In making her decision, the ALJ properly considered "various factors, including the objective medical evidence, medical treatment, medications taken and comments regarding the claimant's activities of daily living." (R. 23). The ALJ properly found these factors were inconsistent with his self-assessed limitations. 20 C.F.R. §§ 404.1529(c)(3)(1), 416.929(c)(3)(I).[1]

In regards to Mr. Bielefeldt's daily activities, the ALJ noted that not only does Mr. Bielefeldt take care of his own personal needs, he also volunteers with Treasured Friends. (R. 24). The ALJ explained that his volunteer duties include: handling animals that weigh 20-50 pounds, transporting animals, which usually takes about an hours, and show animals, which may last anywhere from 2-3 hours. *Id.* The ALJ found that even though Mr. Bielefeldt only volunteers about once a week, these activities shed some light

---

[1] The practice intransigently adhered to by ALJs of linking credibility to the RFC determination unfortunately appears in this case as in so many others. It is a mystery what prompts the ALJs to so stubbornly adhere to a formula that the Seventh Circuit has repeatedly criticized as "meaningless," *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir.2010), "unhelpful," *Shauger v. Astrue,* 675 F.3d 690, 696–97 (7th Cir.2012), and "opaque." *Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir.2012). The difficulty with what the ALJs obdurately insist on doing is that it backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson,* 671 F.3d at 645–46. But its use, while insufficient to support a credibility finding, does not make a credibility determination invalid. *Richison v. Astrue,* 2012 WL 377674, *3 (7th Cir.2012); *Adams v. Astrue,* 2012 WL 3065299, *9 (N.D.Ill.2012). The failure to support a credibility determination with explanation and evidence from the record does. *Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir.2011). Here, the ALJ went beyond the template and carefully explained the basis on which she made her credibility determination.

on his abilities, which are inconsistent with his self-assessed limitations. (R. 24). *See Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir.2008) (ALJ provided valid reasoning for his adverse decision which included the fact that the claimant participated in aquatic-exercise classes and regular walking throughout the week).  Specifically, the ALJ addressed Mr. Bielefeldt's claims that he cannot "stoop, bend forward, kneel or reach, and can only sit/stand for about 30-45 minutes." *Id.* The ALJ explained that while Mr. Bielefeldt is volunteering, it is very likely he is lifting a fair amount of weight and bending over to pick up the animals. *Id.* Despite Mr. Bielefeldt's argument that these minimal activities are not consistent with those of gainful employment, these activities do indicate that, although not at his best, he is not "disabled." *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008)(finding that non-work activities such as lawn mowing, etc., are an indication that a person can perform sedentary work and is not totally disabled by back pain).

The ALJ also discussed other examples of inconsistencies in Mr. Bielefeldt's daily activities, which include: in his Disability Report, Mr. Bielefeldt claimed that he cannot stoop, bend forward, kneel, reach or sit for more than fifteen minutes or stand for long periods of time, but testified at trial he was able to sit for 30-45 minutes. (R. 23). As he points out in his brief, and as the ALJ noted, he is able to sit or stand with pets on a leash at shows for 2 to 3 hours.  (R. 65; *Plaintiff's* Brief, at 12).  Also, he claimed that his medications make it so he cannot drive, but he later testified that he often drives because his wife's vision is poor. (R. 23). Inconsistencies between case records and a plaintiff's testimony strongly detract from one's credibility. SSR 96-7p, 1996 WL 374186.

In his response, Mr. Bielefeldt mistakenly applies both of these examples to the context of driving. He argues that his short trips do not constitute driving "often," and are consistent with his statements that he can only remain seated for a period of 45 minutes. (*Plaintiff's Brief*, pg. 10). However, implicit in both of these arguments is the fact that Mr. Bielefeldt is able to drive, which directly contradicts the self-assessed limitation that the ALJ was concerned with. The ALJ's decision to find Mr. Bielefeldt not credible did not turn on the frequency or duration of his driving habits. Rather, it was because he claimed his medications made it "impossible" for him to drive, but was able to drive around for "errands related to the shelter as well as performing personal errands such as driving to the hearing." (R. 24). Moreover, the fact that Mr. Bielefeldt generally told his doctors his medications did not produce any side effects also discounted the credibility of his statements. (R. 350-52, 355, 360, 363). "Although an ALJ may not ignore a claimant's subjective reports of pain simply because they are not supported by the medical evidence, discrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). The ALJ found these inconsistencies to be significant in her credibility determination. (R. 25).

Finally, the ALJ also properly considered both the objective medical evidence, and his particularly medications. 20 C.F.R. §§ 404.1529(c)(3)(iv), 404.159(c)(v) 416.929(c)(3)(iv), 416.929(c)(v). The ALJ discussed that in October 2007 a clinical exam determined that Mr. Bielefeldt weighed 334 pounds. (R. 24). It was determined that his range of motion was generally normal, but he was experiencing some strain or pain. *Id.* The ALJ noted that an MRI revealed that Mr. Bielefeldt had multi-level degenerative disc disease, and that Dr. Payne recommends a fusion, but at the hearing, Mr. Bielefeldt

still had not undergone the surgery. *Id.* The ALJ suggests that Dr. Payne would like to hold off on the fusion and continue treatment, which is consistent with the record. (R. 24, 352). This also suggests that his pain was perhaps not as severe as he has described. The ALJ also referenced Mr. Bielefeldt's use of Oxycontin, and noted that Mr. Bielefeldt claimed that he experienced excellent pain control. The ALJ noted that overall Mr. Bielefeldt performed better while on medication. (R. 24).

Although Mr. Bielefeldt argues that the ALJ failed to consider his change of medication, in her decision, the ALJ referred to records that demonstrated that Mr. Bielefeldt experienced relief on other medications aside from Oxycontin. (R. 24, 368, 372). Once again, Mr. Bielefeldt's brief claims that his medication was changed due to pancreatitis and gall bladder disease, but the evidence cited, a clinical note from June 2008 (*Plaintiff's Brief*, at 11), does not support this. The diagnosis of gallbladder disease and/or pancreatitis did not occur until October 2008. (R. 380-74). Obviously, it is a misrepresentation of the record to say that medication was changed in June 2008 due to pancreatitis when it would not be diagnosed for another four months. It should also be noted that the June 2008 note did not mention a change away from Oxycodone. It specifically includes order to *refill* a prescription for Vicoprofen, which is, in fact, an opioid analgesic, http://www.rxlist.com/vicoprofen-drug.htm, just like Oxycodone is.

In the end, when making a determination the ALJ is not required to discuss every piece of evidence; she must only establish a logical bridge, which she has done here. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Accordingly, because an ALJ's credibility determination is valid so long as there is some support in the record, as is here,

the ALJ's decision regarding Mr. Bielefeldt's credibility is affirmed. *Schmidt*, 496 F.3d at 842.

## CONCLUSION

The Plaintiff's motion for remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

DATE: 5/17/13